UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| JAMES "MICHAEL" MCCULLAR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:05-CV-042 WCL |
| | ) | |
| KURT BABB, | ) | |
| | ) | |
| Defendant | | |

## OPINION AND ORDER

Before the court is Defendant Kurt Babb's ("Babb's") Motion for Summary Judgment filed on December 21, 2005. Plaintiff James McCullar ("McCullar") responded on January 18, 2006 to which Babb replied on January 23, 2006. For the following reasons, Babb's Motion for Summary Judgment will be GRANTED.

**Summary Judgment Standard**

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). However, Rule 56(c) is not a requirement that the moving party negate his opponent's claim. *Fitzpatrick v. Catholic Bishop of Chicago*, 916 F.2d 1254, 1256 (7th Cir. 1990). A scintilla of evidence in support of the non-moving party's position is not sufficient to successfully oppose summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *Id*. at 2512; *In Re Matter of Wildman*, 859 F.2d 553, 557 (7th Cir. 1988); *Klein v. Ryan*, 847 F.2d 368, 374 (7th Cir. 1988); *Valentine v. Joliet Township High School District No. 204*, 802

1

F.2d 981, 986 (7th Cir. 1986).  No genuine issue for trial exists "where the record as a whole could not lead a rational trier of fact to find for the nonmoving party."  *Juarez v. Ameritech Mobile Communications, Inc.*, 957 F.2d 317, 322 (7th Cir. 1992)(quoting *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986)).

Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute because the issue of fact must be genuine.  Fed. R. Civ. P. 56(c), (e).  To establish a genuine issue of fact, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356; *First National Bank of Cicero v. Lewco Securities Corp.*, 860 F.2d 1407, 1411 (7th Cir. 1988).  The non-moving party must come forward with specific facts showing that there is a genuine issue for trial.  *Id*.  A summary judgment determination is essentially an inquiry as to "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52, 106 S.Ct. at 2512.

**Factual Background**

At the time of the incident leading to this lawsuit, McCullar was incarcerated as a pretrial detainee in the Whitley County Jail ("the Jail") and had been a resident of the Whitley County Jail for exactly one week.  Babb is a Deputy Sheriff with the Whitley County Sheriff's Department and a Correctional Officer in the Jail.  At all times relevant to the present lawsuit, Babb was a person acting under color of state law.

In February 2004, the Jail had in effect a written policy regarding the procedure for exchanging clothing for jail inmates.  The policy provides in relevant part:

> **POLICY**
> To exchange clean jail clothing and linen for every inmate in the facility.

2

> To ensure proper distribution and control over issued articles.
> To control clothing exchange in reference to the public entering the jail facility.
>
> **STANDARDS**
>
> Each jail shall provide for the issue of suitable clothing, bedding, and towels to each new inmate.  Clean clothing, bedding and towels shall be issued at least weekly.  These items shall be maintained in sufficient number to supply each jails inmate population.
>
> **PROCEDURES**
>
> A. Block Clothing Exchange:
>
> 14. Clothing exchange for blocks "A", "B", "C", AND "D" will be done on Sunday and Wednesday of each week.
>
> 15. Clothing exchange for blocks "E", "F", "G", AND "H" will be done on Monday and Thursday of each week.
>
> * * *
>
> 19. If there has been damage sustained, by the inmate, to any issued article – the cost of that article will be deducted from that inmate's trust fund. When clean articles are issued, ensure there is no damage to the articles. Depending on the damage, the Jail Commander has the option to file criminal charges (criminal mischief, etc.) Against[sic] the inmate.
>
> B. Control of Clothing Distribution in the blocks:
>
> 1. If the inmate does not turn in an article, he will not be re-issued that article...
>
> 3. The above rules will ensure a secure and orderly clothing exchange as well as better control over lost, damaged, or extra clothing/linen problems.

When McCullar was booked into the Jail, he received information about the jail rules and procedures including this clothing exchange procedure.

On January 16, 2004, McCullar and other inmates were subject to the clothing exchange procedure.  This was the first time McCullar had been subject to this procedure in the Whitley County Jail.  McCullar observed the inmates in cells near him exchanging their dirty clothes and

3

receiving clean clothes. All of the inmates before him were required to strip out of their dirty clothes, including their underwear, and hand them to Babb and another male officer prior to receiving clean clothes. Beth Lehman ("Lehman"), a female guard, was not in the cell block with the male inmates but was controlling the cell block doors during this procedure.

During the clothing exchange process, McCullar overheard Babb, the other male officer, some and other inmates making lewd remarks about the genitals of the inmate before him. McCullar indicated that the officers and other inmates were laughing because the inmate had an erection and "they thought it was the funniest thing in the world." (McCullar Dep. at 19). These remarks made McCullar uncomfortable.

When it was McCullar's turn to proceed through the clothing exchange process, Officer Babb instructed McCullar to "show him his oranges," in reference to the orange jumpsuit uniforms inmates are required to wear. Because McCullar was not wearing underwear at the time, he requested that he be given underwear to wear before changing out of his orange uniform. Officer Babb, in turn, repeated in a louder tone his command for McCullar to show him his oranges. McCullar then asked again if he could have underwear first. Officer Babb then screamed at McCullar to show him his oranges to which McCullar did not respond. During this exchange, Lehman came to the door of the cellblock which was approximately twenty-five (25) feet away.

After McCullar did not follow Officer Babb's direction, Babb forced McCullar to the door of his cell and ordered him to change out of his oranges. McCullar testified that "[Babb] was wanting to embarrass me" and that "he was being vindictive." (McCullar Dep. at 26).[1] However,

---

[1] McCullar testified that he was concerned about exposing himself in front of the other inmates and the female guard because it was cold in the cellblock and he believed his genitals would be smaller than their normal size thus subjecting him to ridicule.

4

McCullar did not ask if he could step back into his cell to change out of his oranges to avoid exposing himself. Officer Babb then demanded for the fifth time that McCullar remove his oranges. In response, McCullar pulled his pants down and remarked "you must want to see my [cock]." (*Id.*). Officer Babb then grabbed McCullar and yanked him from the cell into the middle of the cell block. (*Id.* at 27). It is unclear to the court whether McCullar was then forced to change out of his oranges while standing outside of his cell or merely ordered again to do so. The inference from McCullar's complaint is that Babb forced him to publicly disrobe since he alleges that Lehman saw him disrobe and that this caused him emotional distress.

In any event, according to McCullar, Officer Babb was screaming and cursing at him and then handcuffed him claiming that he was resisting Babb. McCullar further testified that Officer Babb jerked on the handcuffs all the while screaming at him, and was manhandling him and yanking him from side to side pulling on his wrists and shoulders.[2] Officer Babb proceeded to take McCullar to the "rubber room" which is utilized for solitary confinement. After Babb closed the door to the room, McCullar kicked the door. Babb then opened the door, took out his mace, and told McCullar that if he touched the door again, Babb would use the mace on him. During this entire time, McCullar testified that he did not resist Babb in any way. He further admits not following Officer Babb's order to disrobe during the clothing exchange process.

McCullar remained in solitary confinement approximately eight (8) to ten (10) minutes. While in solitary confinement, McCullar was extremely upset, feeling he had been ordered to disrobe in front of a female guard and in front of the other inmates. He was crying and took several

---

[2]There is some discussion in the record implying that Officer Babb intentionally spit in McCullar's face during this exchange. However, it appears that this reference is not, as plaintiff seems to suggest, an intentional and purposeful expelling of body fluids into McCullar's face but a residual effect of Officer Babb's yelling.

5

minutes to "gather his wits about himself" (*Id.* at 32).  When Officer Babb removed McCullar from solitary confinement their tempers had both subsided.  Officer Babb explained to McCullar that his intent was not to demean him but to follow the Jail's policy.  McCullar testified that he suffered no physical injury as a result of the encounter and did not request to see a jail doctor or nurse following the incident.  (*Id.* at 79).  Officer Babb's jerking on the handcuffs did cause him some temporary discomfort and pain.

Based on these facts, McCullar brought suit pursuant to 42 U.S.C. §1983 alleging violations of his constitutional rights under the Fourth, Eighth, and Fourteenth Amendments.  Babb argues in response that he did not violate McCullar's constitutional rights and, even if he did, qualified immunity shields him from liability.  After a review of the subtleties of §1983 actions, the court shall examine these arguments.

**Claim under 42 U.S.C. § 1983**

Section 1983 is not a source of substantive rights but instead provides "a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 114 S.Ct. 807, 811 (1994).  To prevail on a claim under section 1983, plaintiff must therefore show "(1) the defendant deprived the plaintiff of a right secured by the Constitution and laws of the United States, and (2) the defendant acted under color of state law." *Reed v. City of Chicago*, 77 F.3d 1049, 1051 (7th Cir. 1996); *see also, Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 1913 (1981); *Gomez v. Toledo*, 446 U.S. 635, 640, 100 S.Ct. 1920, 1923 (1980).  Here, there is no question that Officer Babb was acting pursuant to state law.  Thus, the remaining question is whether plaintiff has raised a genuine issue of material fact that a constitutional violation occurred.

Plaintiff asserts initially that the requirement that McCullar disrobe in the presence of other

6

inmates during the clothing-exchange procedure violates his Fourth Amendment right against unreasonable searches. However, lawful incarceration necessarily entails limitations upon many of the rights enjoyed by ordinary citizens. An inmate's fourth amendment rights are among the rights subject to curtailment. In particular, the fourth amendment does not protect an inmate from the seizure and destruction of his property. *See Hudson* v. *Palmer,* 468 U.S. 517, 526 (1984) (declaring that inmates have no reasonable expectation of privacy in their cells entitling them to the protection of the Fourth Amendment against unreasonable searches); see also *Bell v. Wolfish*, 441 U.S. 520, 558 (1979) (holding that routine body cavity searches of prisoners conducted after contact visits with outside persons do not violate the Fourth Amendment so long as they are conducted reasonably).

While the Supreme Court has indicated that the Fourth Amendment's proscriptions are inapplicable in the prison setting, a prisoner is not without all rights to bodily privacy. There is a constitutional right to privacy, see, e.g. *Carey v. Population Services, Int'l,* 431 U.S. 678, 684-86 (1977); *Roe v. Wade,* 410 U.S. 113, 152-56 (1973); *Griswold v. Connecticut,* 381 U.S. 479, 484-86 (1965), even in a prison setting, although the inmate's right to privacy must yield to the penal institution's need to maintain security. *See Hickman v. Jackson*, 2005 WL 1862425 (E.D.Va. August 9, 2005) (citing cases holding that prisoners retain some degree of privacy and indicating that "if an inmate's privacy can be maintained without compromising prison operations, then that privacy should be respected").

Based on this theory, McCullar asserts that he has a right against involuntary exposure of his unclothed body in the presence of persons of the opposite sex, at least in non-emergency situations such as a routine clothing exchange. *Hickman*, supra. McCullar does not expressly challenge the constitutionality of the clothing exchange policy itself nor does he make any express objection (he

7

does impliedly object) to the presence of a female guard in the cell block as *ipso facto* violative of his privacy rights.  What McCullar expressly challenges is the manner in which the clothing exchange policy was executed by Babb.  For instance, he claims that Babb required him to strip down with full knowledge that he did not have underwear and that Babb's actions "were conducted in a manner intended to humiliate and inflict psychological pain" thereby violating his rights. (Pltf's Brief p. 5; see also, Pltf's Brief, p. 4:  "forcing Plaintiff to strip, knowing that he did not have underwear, and exposing his naked body to the female guard and other inmates for the purpose of the wanton infliction of pain was 'so totally without penological justification that it results in the gratuitous infliction of suffering," thereby violating the Eighth Amendment.").  The court turns now to these assertions.

   a.    **Right to Privacy**

As the court has already established, prisoners have a limited constitutional right to personal privacy which cannot be violated absent legitimate penological interests.  When the inmate privacy issue has arisen in the context of unclothed prisoners being viewed by guards of the opposite sex, courts have consistently based their decisions on the frequency, regularity, and predictability with which such incidents occurred. See *Cumbey v. Meachum,* 684 F.2d 712 (10th Cir. 1982); *Ashann-Ra v. Com. of Va.*, 112 F.Supp.2d 559 (W.D.Va. 2000) (holding routinized exposure of male inmates' unclothed persons to female guards may constitute constitutional violation); *Riddick v. Sutton,* 794 F.Supp. 169 (E.D.N.C. 1992) (infrequent viewing by female guard of male inmate while in shower was reasonably related to penological interest);  *Lee v. Down*s, 641 F.2d 1117, 1119-1120 (4th Cir. 1981) (a violation of female inmate's privacy rights for male guards to remain in room and restrain inmate while her clothes were forcibly removed, where inmate had agreed to voluntarily remove her

clothes if male guards left room; but *not* a constitutional violation for male guards to restrain her during body search by female guard after inmate herself removed dress and set fire to it--inmate was resisting search and immediate search was necessary); *Hudson v. Goodlander,* 494 F.Supp. 890, 893 (D.Md.1980) (male inmate's rights violated by assignment of female guards to posts where they could view him while he was completely unclothed); *Avery v. Perrin,* 473 F.Supp. 90, 92 (D.N.Hamp.1979) (male inmate's right to privacy *not* violated by female mail clerk who walked passed his cell at same time every day).

      Indeed, courts examining this issue have repeatedly held that guards must be allowed employment in prisons housing inmates of the opposite sex, but that a balance must be struck between equal employment rights and inmates' privacy interests. *See, e.g., Johnson v. Phelan,* 69 F.3d 144, 146-47 (7th Cir.) ("Unless female guards are shuffled off to back office jobs, itself problematic under Title VII, they are bound to see the male prisoners in states of undress. Frequently. Deliberately. Otherwise they are not doing their jobs … If only men can monitor showers, then female guards are less useful to the prison…"); *Canedy v. Boardman,* 16 F.3d 183, 185-87 (7th Cir.1994) ( [W]hile all forced observations or inspections of the naked body implicate a privacy concern, it is generally considered a greater invasion to have one's naked body viewed by a member of the opposite sex … The judicial inquiry, then is to 'balanc[e] the significant and legitimate security interests of the institution against the privacy interests of the inmates.'… [A] state's interest in providing equal employment opportunity should likewise be weighed against the invasion of a prisoner's privacy interest … [O]ccasional or inadvertent sighting by female prison employees of inmates in their cells or open showers do not violate the inmates' right to privacy."); *Forts v. Ward,* 621 F.2d 1210, 1211, 1216, 1217 (2d Cir.1980) ("The modern sensitivity to the

significance of gender in American life and law has made it inevitable that cases will arise where gender-based legal contentions conflict. .. [T]he remedy adopted to protect the privacy of the inmates in their cells during nighttime hours has placed privacy and employment rights in direct conflict.""The privacy interest entitled to protection concerns the involuntary viewing of private parts of the body by members of the opposite sex."); *Letcher v. Turner,* 968 F.2d 508, 510 (5th Cir.1992) ("[T]his Court [has] held that no constitutional violation occurs when naked male inmates are viewed by female guards if the presence of female guards is required to protect a legitimate government interest such as maintaining security at a correctional facility. Given these principles, which we endorse, there is no basis for [male plaintiff's] claim of a constitutional violation due to the presence of female guards during the strip search."); *Timm v. Gunter,* 917 F.2d 1093, 1099-1100, 1102 (8th Cir.1990) ("[W]hen addressing an inmate's claim of alleged constitutional violations, we must consider whether the constrictions that prison administrators have placed on the inmate's rights are justified by legitimate institutional concerns···· The judgment exercised by prison administrators in striking a balance between the rights of prisoners and the demands of institutional security is to be given great deference.").

 Because this balance must be struck, a prisoner's privacy rights are violated by frequent and close, as opposed to occasional and indirect, viewing of a naked prisoner by a guard of the opposite sex. For example, in *Canedy v. Boardman,* 16 F.3d 183 (7th Cir.1994), cited by McCullar in the present case, a male inmate alleged that two female prison guards strip-searched him while ten male corrections officers were nearby who could have done the search. *Id.* at 184. He also alleged that female officers "regularly observe male inmates in a variety of settings typically considered private, including while they dress, shower, defecate and sleep in various states of undress." *Id.* The district

10

court dismissed the prisoner's § 1983 complaint pursuant to Fed.R.Civ.P. 12(b)(6). *See Canedy v. Boardman,* 16 F.3d at 184. The Seventh Circuit reversed, writing:

> The right to privacy is now firmly ensconced among the individual liberties protected by our Constitution. Moreover, "[o]ne of the clearest forms of degradation in Western Society is to strip a person of his clothes. The right to be free from strip searches and degrading body inspections is thus basic to the concept of privacy." "It is settled now ⋯ that the Constitution places limits on a State's right to interfere with a person's ⋯ bodily integrity." Further, as the district court noted, *while all forced observations or inspections of the naked body implicate a privacy concern, it is generally considered a greater invasion to have one's naked body viewed by a member of the opposite sex.* Some diminution of privacy is of course to be expected in prison⋯.

However, even in this case, the Seventh Circuit recognized that, while "the justifiable reasons for invading an inmate's privacy are both obvious and easily established," the "surrender of privacy is not total and that some residuum meriting [constitutional protection] survives the transfer into custody."⋯The judicial inquiry, then is to "balanc[e] the significant and legitimate security interests of the institution against the privacy interests of the inmates."

Applying this inquiry to the present case, it is clear that the significant and legitimate security interests of the jail in providing for a controlled clothing exchange procedure outweigh McCullar's right to personal privacy, especially when considering the particular facts of this case. First, it is critical to note that unlike the allegations made in *Canedy,* McCullar has not alleged nor have the facts borne out that Lehman or any other female guard routinely saw him unclothed by virtue of her position as a guard. This was an anomaly occasioned by McCullar's own refusal to obey an order from Babb to remove his clothing while inside his cell. Had McCullar complied, the clothing exchange procedure would have proceeded, he would have received his clothing change without incident, and Lehman would not have had to come to the door to the cell block to further investigate

11

the incident. More importantly, it is clear that at the time of the clothing exchange, Lehman was engaged in a legitimate security function of operating the cellblock doors. She was not the primary individual charged with the clothing exchange procedure, a fact which might raise a legitimate privacy concern, and she only viewed McCullar nude when he created a security problem  Thus, under these facts, the mere viewing by Lehman of McCullar while naked did not violate his right to privacy.

### b. Cruel and Unusual Punishment

McCullar next focuses on Officer Babb's conduct claiming that the request to disrobe in front of Lehman knowing that he did not have underwear  was calculated to humiliate and embarrass him thereby violating his rights against cruel and unusual punishment. He also argues that the use of force by Officer Babb to force compliance with his order to disrobe was further designed to humiliate him.

As noted earlier, at the time of these events, McCullar was a pretrial detainee at the Jail. "Claims involving the mistreatment of ... pretrial detainees in custody are governed by the Fourteenth Amendment's Due Process Clause instead of the Eighth Amendment's Cruel and Unusual Punishment Clause, which applies to such claims by convicted prisoners." *Cottrell v. Caldwell,* 85 F.3d 1480, 1490 (11th Cir.1996). But it makes no difference whether was a pretrial detainee or a convicted prisoner because "the applicable standard is the same, so decisional law involving prison inmates applies equally to cases involving ... pretrial detainees." *Id.*

Regardless of which Amendment provides the constitutional basis for the relief McCullar seeks, the question here is whether Officer Babb acted "maliciously and sadistically for the very purpose of causing harm," rather than in a good-faith effort to comply with prison policy. *Hudson*

12

*v. McMillian,* 503 U.S. 1, 6(1992).  Simply put, this court's review of the record finds  no evidence from which the court can conclude that a genuine issue of material fact exists on this point.  Officer Babb, by McCullar's own admission, conducted the clothing exchange procedure the same for all of the inmates prior to McCullar.  McCullar knew that he would have to remove his "oranges" before receiving clean clothes and, when asked to do so, refused and refused and refused.  While the court can envision circumstances where a confinement officer would act maliciously, (for instance, had Officer Babb singled out McCullar initially,  removed him from his cell, and forced him to disrobe in front of all the other inmates), but this is not what occurred here.  There is no evidence of Officer Babb purposely and specifically seeking out McCullar to humiliate him or otherwise changing the manner in which he conducted the clothing exchange procedure so as to single out McCullar from the other inmates.  As a result, there is no constitutional deprivation .

McCullar also asserts that the use of force by Officer Babb contributed to the maliciousness and was not a good faith effort to maintain or restore discipline." *Id.*  The court could not disagree more.  It was certainly reasonable for Officer Babb to remove McCullar forcibly from his cell when he refused at least four times to follow Officer Babb's instructions.  Confinement officers face particular perils by virtue of their setting and McCullar's recalcitrance interfered with the intent of the Jail's clothing exchange policy, i.e., to provide an orderly *and controlled* exchange procedure.  Thus, the court finds no fault with Officer Babb's decision to remove McCullar from his cell.

As for the reasonableness of the force applied, the most that occurred here, even crediting plaintiff's version of the facts is some harsh treatment including shoving, yelling, handcuffing McCullar and pulling him from his cell.  This is certainly not the indicia of an excessive force claim.  See *DeWalt v. Carter,* 224 F.3d 607, 620 (7th Cir.2000) (holding that prison guard's "simple act of

13

shoving" inmate into a door frame was not an Eighth Amendment violation). There was no physical injury and only temporary discomfort experienced by McCullar, both of which signal the absence of the use of excessive force. Indeed, the existence or absence of physical injury is clearly relevant to the determination whether the use or display of force is constitutionally excessive. *See Hudson,* 503 U.S. at 7 ("The absence of serious injury is ... relevant to the Eighth Amendment inquiry but does not end it."). Accordingly, the court concludes that any force used was *de minimis* and no constitutional violation occurred.

## Conclusion

In sum, the Plaintiff has not demonstrated a constitutional violation based upon his treatment during the Jail's clothing exchange procedure. As a result, he cannot prevail on his claim pursuant to 42 U.S.C. §1983. Because the court concludes that no constitutional deprivation occurred, it need not consider the defendant's alternative argument that he is entitled to qualified immunity. Defendant's Motion for Summary Judgment is GRANTED. The Clerk is directed to enter judgment in favor of the Defendant.

Entered: This 10th day of March, 2006

s/ William C. Lee
United States District Court
Northern District of Indiana
